Carol KERVIN and Charles
Kervin, Plaintiffs,

v.

**RED RIVER SKI AREA,
INC., Defendant.**

No. B–88–590–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

April 11, 1989.

this lawsuit.

Steven C. Barkley, Lindsay, Moses & Barkley, Beaumont, Tex., for plaintiffs.

Arthur R. Almquist, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., for defendant.

## MEMORANDUM OPINION

SCHELL, District Judge.

The motion at bar presents this Court with the interesting question of whether the non-resident defendant's contacts with Texas, which include the solicitation of Texas residents to attend its New Mexico ski resort, constitute the kind of "continuous and systematic" contacts which warrant this Court's assertion of general *in personam* jurisdiction. This lawsuit arises from a personal injury allegedly sustained by Car-

ol Kervin while vacationing at a ski resort owned and operated by the defendant, Red River Ski Area, Inc. (Red River), a New Mexico corporation. Finding that Red River's contacts with Texas are indeed continuous and systematic, the Court denies the motion to dismiss. The Court also denies Red River's motion to transfer venue.

## I. BACKGROUND

Carol and Charles Kervin are citizens of Texas and residents of Warren, Texas, in the Eastern District of Texas. They brought this diversity action to recover damages for injuries allegedly sustained by Mrs. Kervin during their January, 1987, ski trip to the Red River Ski Area. Mrs. Kervin purportedly suffered a fall while attempting to descend a flight of wooden steps leading to the ski lodge. The Complaint alleges that defendant was negligent in failing to maintain the steps in a safe manner. Mrs. Kervin seeks damages for medical expenses, pain and suffering, loss of earning capacity, and mental anguish. Her husband seeks damages for loss of consortium.

Red River originally moved to dismiss on August 1, 1988. The Court denied that motion. Soon thereafter, Red River moved the Court to reconsider that Order. Since the Motion to Reconsider contains argument considerably more detailed than that contained in its original motion, the Court will reconsider its prior order denying the motion to dismiss.

Attached to the Motion to Reconsider is the affidavit of George Blanchard, Red River's President. Blanchard's affidavit contains a recitation of denials of contacts with Texas: Red River is not doing business in Texas, owns no property in Texas, has no assets in Texas, is not licensed to do business in Texas, sells no tickets in Texas, has no contacts with any ski shops or travel agencies in Texas, etc. Blanchard admitted only one contact with Texas: one advertisement in one magazine "whose general circulation would have been available in Texas."

Plaintiffs' initial response to the motion contains only Carol Kervin's brief affidavit

attached thereto and bald assertions that defendant's "substantial" contacts with Texas justify its subjection to this Court's *in personam* jurisdiction. Mrs. Kervin's affidavit avers that she saw television advertisements for Red River in the west Texas area and magazine advertisements in ski magazines purchased in Texas, that travel agents recommended Red River, that Red River mailed an information packet to her home in Jasper, and that a "substantial number" of the vacationers were from Texas. These general assertions by plaintiffs of defendant's contacts with Texas fall short of the proof necessary to justify this Court's assertion of general jurisdiction. Plaintiffs, however, previously requested additional time to conduct limited discovery on the issue of jurisdiction, which this Court granted. In accordance therewith, plaintiffs have recently filed their Supplemental Response arguing the fruits of the additional discovery, the most significant part of which is that obtained through the deposition of Drew Judycki, Red River's General Manager and Vice President. Plaintiffs have also brought before the Court copies of magazine prints advertising defendant's facility.

Defendant filed a reply to plaintiffs' response, asserting that plaintiffs have again failed to demonstrate a sufficiently high level of contacts to justify *in personam* jurisdiction. Defendant also moves the Court, in the alternative, to transfer the case to the District of New Mexico. Finally, plaintiffs have submitted a response to defendant's venue transfer argument.

## II. ANALYTICAL FRAMEWORK

### A. *Jurisdictional Analysis in Federal District Court*

■ Fed.R.Civ.P. 4(e) permits service of process on a non-resident defendant pursuant to state statute. Presumably, plaintiffs served Red River in accordance with the Texas Long–Arm Statute, Tex.Civ.Prac. & Rem.Code Ann. §§ 17.041–.045 (Vernon 1986).[1] A federal court sitting in diversity may exercise jurisdiction over a non-resident defendant only to the extent that a state court could do so as permitted by the forum's long-arm statute. *E.g., Interfirst Bank Clifton v. Fernandez*, 844 F.2d 279, 282 (5th Cir.1988); *Breeland v. Hide–A–Way Lake, Inc.*, 585 F.2d 716, 719 (5th Cir.1978). A state court, of course, is limited by federal due process requirements. *See, e.g., Stuart v. Spademan*, 772 F.2d 1185, 1189 (5th Cir.1985); *D.J. Inv., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 545 (5th Cir.1985). Since the Texas Long–Arm Statute confers jurisdiction to the Constitutional limit, *Hall v. Helicopteros Nacionales de Columbia, S.A.*, 638 S.W.2d 870, 872 (Tex.1982), *rev'd on other grounds*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) [hereinafter *Helicopteros*],[2] the jurisdictional analysis

1. Process was served on the Secretary of State of Texas, who is deemed the designated agent of certain non-residents for service of process under § 17.044.

2. The Texas Long–Arm Statute provides a non-exclusive list of what actions by a non-resident constitute "doing business" in Texas:
   Sec. 17.042. ACTS CONSTITUTING BUSINESS IN THIS STATE. In addition to other acts that may constitute doing business, a non-resident does business in this state if the nonresident:
   (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
   (2) commits a tort in whole or in part in this state; or
   (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.
   Tex.Civ.Prac. & Rem.Code Ann. § 17.042 (Vernon 1986).

There apparently existed at one time some controversy over whether the Texas Long–Arm statute required that a plaintiff's cause of action arise from the defendant's contacts with Texas. The controversy originated from the Texas Supreme Court's decision in *O'Brien v. Lanpar Co.*, 399 S.W.2d 340 (Tex.1966), in which the court enunciated a three-prong test for analyzing jurisdiction over a non-resident:
(1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state; (2) *the cause of action must arise from, or be connected with, such act or transaction;* and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the

is identical to a federal due process analysis. *Interfirst Bank Clifton*, 844 F.2d at 282; *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 777 (5th Cir.1986).

### B. Plaintiffs' Burden

When a non-resident defendant challenges *in personam* jurisdiction, the plaintiff bears the burden of demonstrating facts sufficient to support jurisdiction. *Stuart*, 772 F.2d at 1192. The court may determine the jurisdictional issue by considering essentially the entire record. (*Id.*) When jurisdiction is considered without a full evidentiary hearing, the plaintiff need only present *prima facie* proof that the assertion of jurisdiction is proper, rather than proving such by a preponderance of the evidence as required when jurisdiction is contested at a pre-trial evidentiary hearing or at trial. *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir.1986). When considering a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the complaint must be taken as true, and conflicts between the parties' affidavits must be resolved in the plaintiff's favor. *D.J. Inv.*, 754 F.2d at 546.

## III. JURISDICTIONAL FACTS

Red River's contacts with Texas currently before the Court are brought through Mrs. Kervin's affidavit and plaintiffs' Supplemental Response and exhibits thereto, which consist of the Judycki deposition transcript and reproductions of Red River's magazine advertisements and promotional brochure. In light of the foregoing standards for determining a motion to dismiss for lack of jurisdiction over the person, the Court accepts the following contacts with Texas as true:

*Advertising.* Red River has advertised in two nationally circulated magazines on one occasion each, *Ski* and *Skiing*.[3] These publications are circulated in Texas. Mrs. Kervin purchased the issues in Texas and saw these ads.

Of greater significance, Red River has engaged in promotional activities within the state of Texas through the use of local advertising media. It has run one advertisement in *Accent West*, a local magazine targeted directly at the Amarillo, Texas area.[4] It advertises on "five or six" billboards in the Texas and Oklahoma panhandles, exchanging lift tickets for such advertisements with the billboards owner, a resident of San Angelo, Texas.[5] It has run an

---

forum state afforded the respective parties, and the basic equities of the situation. *Id.* at 342; *U–Anchor Advertising, Inc., v. Burt*, 553 S.W.2d 760, 762 (Tex.1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978). In 1981, the Fifth Circuit stated that the Texas Long–Arm Statute "reaches only suits arising out of contacts with Texas." *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1265 (5th Cir.1981). The next year, however, in *Helicopteros*, the Texas Supreme Court announced that the nexus prong is needed only when a defendant maintains "single or few contacts" with Texas, but is unnecessary when the non-resident defendant's "presence in the forum through numerous contacts is of such a nature ... so as to satisfy the demand of the ultimate test of due process." 638 S.W.2d at 872. This aligns the Texas Long–Arm statute with federal due process, since the latter recognizes the distinction between specific jurisdiction (nexus requirement) and general jurisdiction (no nexus). Constitutional due process is discussed later in this opinion. The Texas Supreme Court has very recently reinforced this position. *See Schlobohm v. Schapiro*, 759 S.W.2d 470 (Tex.1988).

3. This ad is a two-page print reproduced as Exhibit "3" to plaintiffs' Supplemental Re-

sponse. The ads ran sometime between January 1986 and December 1987. The ads were actually purchased by Ski New Mexico, an organization which arranges for the promotional activities of its members. Defendant belongs to this organization and pays dues for its membership. Ski New Mexico is composed of just under 200 members, including ten ski areas in New Mexico.

For present purposes, the promotional activities of Ski New Mexico in securing advertising are attributed to Red River because Red River furnishes financial consideration to Ski New Mexico in the form of membership dues. One of Ski New Mexico's primary functions, as Red River is no doubt aware, is promotion of the business interests of its membership.

4. Red River, rather than Ski New Mexico, directly procured this ad.

5. Judycki's deposition revealed that the owner erects a Red River advertisement whenever a billboard is not in current use. In exchange, Red River provides the billboards owner with lift tickets.

advertisement in *Texas Monthly* magazine.[6] It has also advertised in Texas newspapers.[7]

Mrs. Kervin alleged in her affidavit that she saw Red River Ski Area ads on television stations in the Hereford and Lubbock, Texas, areas. The record is unclear whether these ads were actually run on stations inside Texas or were broadcast from New Mexico into Texas. Judycki's deposition failed to clarify this ambiguity. Accordingly, unable to conclude that these ads were local in character and unwilling to speculate, the Court analogizes them to print advertisements in nationally circulated magazines.

*Shareholders' Residences.* Red River is privately held by five shareholders, four of whom reside in Amarillo, Texas. The other shareholder maintains residences in both Red River, New Mexico and Texas, and spends more than half his time in New Mexico.

*Incorporation.* Red River was originally incorporated in Texas, but later dissolved and reincorporated in New Mexico.

*Recruitment of Employees.* Red River recruits ski instructors from universities in Texas.

*Travel agencies.* Red River does a "small amount" of business through travel agencies. It has no contracts with travel agencies in Texas, but accepts their referrals. Judycki stated that he was "sure" they've done some business with travel agents in Texas. Transcript at 13–15. These travel agencies deduct commissions before transmitting client funds to Red River.

*Mail.* Once contacted by an agent or by a prospective client in Texas, Red River mails a promotional brochure into this state. The brochure is reproduced as Exhibit "2" to plaintiffs' Supplemental Response. Mrs. Kervin asserted in her affidavit that she received a "packet of information" through the mail at her home in Warren, Texas.

*Brochure Printer.* Red River procures the services of a printer in Amarillo for the printing of its brochures.

*Texas Clientele.* Approximately 47% of Red River's clientele is comprised of Texas residents.[8]

*Texas CPA.* Red River currently employs the services of a CPA in Amarillo.[9]

## IV. IN PERSONAM JURISDICTION

The Fourteenth Amendment Due Process Clause limits states' ability to assert personal jurisdiction over non-resident defen-

---

**6.** The Court assumes that the *Texas Monthly* ad was identical to the two-page print appearing in *Ski* and *Skiing*, reproduced as Exhibit "3" to plaintiffs' Supplemental Response. When asked to identify this ad in his deposition, Judycki stated that it had been "inserted" in "ski magazines, *Skiing* magazine and *Texas Monthly*." Transcript at 18. When discussing the ad later in the deposition, however, he referred only to *Ski* and *Skiing* magazines. Transcript at 23–25. Because of Judycki's earlier statement, the Court concludes that the same ad appeared in *Texas Monthly.* For present purposes, *Texas Monthly* is considered a local publication.

There apparently appeared a Red River ad in *Texas Monthly* on another occasion approximately three years ago, reproduced as Exhibit "1" to plaintiffs' Supplemental Response. This ad, however, was paid for by the Red River, New Mexico, Chamber of Commerce to promote defendant's "Kids Stay Free" program. The Court declines to attribute this advertising contact to Red River, since it furnished no financial consideration for the ad.

**7.** Judycki never identified a specific Texas newspaper. However, when asked, "How would you promote your Texas–Oklahoma business?" he responded, "The ads that we've talked about, newspaper ads, that's another way." The only reasonable conclusion to draw from this testimony is that Red River purchased ads in Texas newspapers. There is no evidence concerning the nature and extent of defendant's newspaper advertising, except that Judycki referred to such in the plural—"ads."

**8.** In addition, approximately 44% comes from Oklahoma. Together, Red River is dependent on Texas and Oklahoma residents for roughly 91% of its business.

**9.** Red River has procured the services of the Amarillo CPA only relatively recently, after the date of the accident. This contact, however, is nevertheless corroborative of a pattern of ongoing business contacts with Texas. The Court must analyze defendant's contacts with Texas over time in determining whether those contacts are continuous and systematic. *See Helicopteros,* 104 S.Ct. at 1870–71.

dants. The virtually enshrined standard for testing the propriety of personal jurisdiction derives from the Supreme Court's well-known delineation in *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) and its progeny: Due process requirements are satisfied when the non-resident defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " The due process analysis consists of a two-prong inquiry: 1) the non-resident must have purposefully established some "minimum contacts" with the forum state; and 2) the exercise of jurisdiction comports with "fair play and substantial justice." *Interfirst Bank Clifton*, 844 F.2d at 282; *Stuart*, 772 F.2d at 1189.

### A. Minimum Contacts

■ To establish minimum contacts, the non-resident must do some act or acts by which it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). The unilateral activity of one claiming a relationship with a non-resident defendant does not satisfy this requirement. *Id.* To the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. *International Shoe*, 326 U.S. at 319, 66 S.Ct. at 159–60. Since *International Shoe*, the Supreme Court has discarded the notion that jurisdiction is grounded on the concept of state power. *Id.* at 316, 66 S.Ct. at 158. The Supreme Court has also diminished the significance of presence within the forum state as a means of establishing jurisdiction, focusing almost entirely upon whether the defendant has " 'such contacts . . . with the state of the forum as make it reasonable . . . to require the corporation to defend the particular suit which is brought there.' "

*Shaffer v. Heitner*, 433 U.S. 186, 203, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977).

Due Process jurisprudence has long recognized a distinction between claims connected to a defendant's contacts with the state and claims unrelated to such contacts. *See International Shoe*, 326 U.S. at 318, 66 S.Ct. at 159. "Specific" *in personam* jurisdiction refers to claims which "arise out of or relate to" the defendant's contacts with the forum. *Helicopteros*, 104 S.Ct. at 1872. The foundation for *in personam* jurisdiction in such a case is the "relationship among the defendant, the forum, and the litigation." *Shaffer*, 433 U.S. at 204, 97 S.Ct. at 2579–80. In specific jurisdiction cases, even a single act may support jurisdiction. *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987).

■ If, on the other hand, a claim is unrelated to the defendant's contacts with the state, a court is not precluded from asserting another type of *in personam* jurisdiction, "general" jurisdiction. A greater level of contacts with the forum state is required in general jurisdiction cases,[10] however, and in such cases the plaintiff must demonstrate that the non-resident defendant's contacts with the forum state are "continuous and systematic." *Helicopteros*, 104 S.Ct. at 1872; *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445–48, 72 S.Ct. 413, 418–20, 96 L.Ed. 485 (1952); *Bearry*, 818 F.2d at 374.

■ This Court cannot assert specific jurisdiction over Red River because the Kervins' cause of action does not arise out of any of its contacts with Texas. Rather, the Kervins' claim arises out of the injuries Mrs. Kervin sustained as the result of Red River's alleged negligence in failing to maintain safe premises at its New Mexico ski resort. *In personam* jurisprudence has taken a restrictive view of the relationship between causes of action and contacts, seemingly to require virtually a direct link

---

**10.** More contact is required because the forum state has no direct interest in the cause of action. *Bearry*, 818 F.2d at 374.

between claim and contacts in order to pursue a specific jurisdiction analysis.[11]

Accordingly, this court may assert general *in personam* jurisdiction over Red River only if plaintiffs have presented *prima facie* proof that Red River has continuous and systematic contacts with Texas. It is an analysis in which this Court does not lightly engage, for *in personam* jurisprudence is replete with cases finding the nonexistence of continuous and systematic contacts.[12] The defendant's contacts with Texas must be quantitatively and qualitatively great enough to warrant the significant conclusion that it has constructively consented to defending a suit in Texas,[13] *Bearry,* 818 F.2d at 375, examining its contacts with Texas *in toto, Holt Oil & Gas,* 801 F.2d at 779. Whether due process is satisfied depends upon the quality and nature of acts done in relation to the fair and orderly administration of laws. *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 159–60. In sum, as the leading commentators on civil procedure have noted, the "threshold contacts required for general jurisdiction are very substantial, indeed." 4 C. Wright and A. Miller, Federal Practice and Procedure § 1067, at 295–98 (1987).

Contemporary general jurisdiction is grounded in *Perkins v. Benguet Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). Benguet Mining Company was a foreign corporation which owned mining properties in the Philippine Islands. Its operations were halted during the occupation of the Islands by the Japanese. In this interim, its president, who also served as general manager and principal shareholder, returned to his home in Ohio, where he maintained an office and carried on affairs of the business. In Ohio, he kept company files, carried on business correspondence, drew and distributed salary checks, maintained two bank accounts containing substantial company funds, employed a bank to act as transfer agent for company stock, held several directors' meetings, and supervised the rehabilitation of the company's properties in the Philippine Islands. The Supreme Court held that Benguet could be sued in an Ohio state court, since the activities of the president in Ohio constituted a "continuous and systematic supervision of the necessarily limited wartime activities of the company," in spite of the fact that Benguet owned no mining properties in Ohio. *Id.* 342 U.S. at 448, 72 S.Ct. at 419–20.

*Helicopteros,* the Supreme Court's latest seminal case on general jurisdiction, dealt with the activities conducted in Texas of a Colombian corporation. The defendant was engaged in the business of providing helicopter transportation for oil and con-

---

**11.** See *Campbell v. Premier Cruise Lines, Ltd.,* 838 F.2d 470 (6th Cir.1988) (Westlaw); *Rittenhouse v. Mabry,* 832 F.2d 1380, 1390 (5th Cir. 1987); *Singletary v. B.R.X., Inc.,* 828 F.2d 1135, 1137 (5th Cir.1987) (injuries unrelated to defendant's advertisements in nationally circulated publications); *Bearry,* 818 F.2d at 376 (product liability action did not arise out of defendant's in-state distribution and advertising); *Solis v. Roller Dome, Inc.,* No. 87–C–9355, 1988 WL 87829 (N.D.Ill. Aug. 15, 1988) (Westlaw) (injuries sustained out-of-state unrelated to defendant's advertisements in in-state telephone directory); *Smith v. Jefferson County Chamber of Commerce,* 683 F.Supp. 536, 538 (D.Md.1988).

In *Helicopteros,* the Supreme Court apparently made no distinction between claims "arising out of" and claims "related to" the defendant's contacts with the forum state. 104 S.Ct. at 1872–73 n. 10. There, however, the parties had stipulated to the absence of a nexus. *Id.* Thus, the Court decided only the question of whether the defendant had continuous and systematic contacts with Texas sufficient for general jurisdiction. Justice Brennan's dissent objected to the majority's failure to distinguish claims "arising out of" and claims "related to" the defendant's contacts. 104 S.Ct. at 1875 (Brennan, J., dissenting). Brennan would have eased the relationship between causes of action and contacts in order to assert specific jurisdiction. In his view, the defendant's contacts with Texas would have met this different notion of nexus and the analysis should therefore have been conducted on specific jurisdiction lines.

**12.** See, *e.g., Helicopteros,* 104 S.Ct. at 1874; *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 774 (5th Cir.1988); *Bearry,* 818 F.2d at 376; *Petroleum Helicopters, Inc. v. Avco Corp.,* 804 F.2d 1367, 1370 (5th Cir.1986); *Turner v. Jack Tar Grand Bahama, Ltd.,* 353 F.2d 954, 956 (5th Cir.1965).

**13.** Consent to suit is a legal fiction employed when a defendant's acts are of such a nature as to justify the fiction. *International Shoe,* 326 U.S. at 318, 66 S.Ct. at 159.

struction companies in South America. Its first contact with Texas occurred in sending its chief executive officer to a negotiation session in Houston with members of a joint venture organized to construct a pipeline in Peru. The negotiations concerned transportation services that the defendant would later provide to the venture. No contract, however, was executed in Texas. Later, defendant purchased helicopters, spare parts, and accessories in Fort Worth and sent prospective pilots and management and maintenance personnel to Fort Worth for training and technical consultation. In addition, defendant received payments from the joint venturers drawn upon a Houston bank.

The Supreme Court held that continuous and systematic contacts were not present. *Id.* 104 S.Ct. at 1874. The Court dismissed the significance of the mere fact that checks were drawn on a Texas bank and also considered defendant's CEO's lone trip to Houston antithetical of continuous and systematic contacts. *Id.* at 1873. The Court collapsed all of defendant's Fort Worth activities into basically one contact, a "package of goods and services purchased," and noted that purchases and related trips, standing alone, do not convey jurisdiction. *Id.* at 1874.

■ Obviously, *in personam* cases require a highly fact-sensitive analysis. In determining whether Red River's contacts with Texas are continuous and systematic, the analysis must focus, to a significant extent, on its purposeful conduct aimed at soliciting Texas clientele to attend its ski resort. Red River has advertised in two nationally circulated publications that are distributed in Texas. And, to the extent

that its west Texas television ads are analogous to advertising in nationally circulated magazines, the television ads are yet another contact in this regard. It is well-established that advertising in a nationally circulated publication, without more, is insufficient to confer general jurisdiction. *Growden v. Ed Bowlin & Assoc.*, 733 F.2d 1149, 1151–52 (5th Cir.1984); *Loumar v. Smith*, 698 F.2d 759, 763–64 (5th Cir.1983). "[A]dvertising reasonably calculated to reach the State," however, may be one among many factors which could support the exercise of jurisdiction. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 566, 62 L.Ed.2d 490 (1980).

■ Of greater significance is Red River's use of in-state media to accomplish its solicitation objectives. *In personam* jurisprudence seems to view the use of local advertising as a stronger contact than advertising in national publications. *See Siskind v. Villa Found. for Education, Inc.*, 642 S.W.2d 434 (Tex.1982).[14] Red River has used local media by advertising in Texas newspapers, on west Texas billboards, in *Texas Monthly*, and in Amarillo *Accent West* magazine. Its use of in-state print media and billboards is noticeably recurrent and regular. Indeed, billboard advertising in west Texas and the Texas panhandle apparently occurs on a year-in, year-out basis.[15] In short, Red River had laid down a pattern of advertising in in-state publications and other media, in addition to national publications, that can most fairly be considered to be both continuous and systematic. It may be that these contacts, without more, are sufficient to establish general jurisdiction.[16]

---

**14.** *See also Growden*, 733 F.2d at 1151–52; *Loumar*, 698 F.2d at 763–64; *Wilkinson v. Carnival Cruise Lines, Inc.*, 645 F.Supp. 318, 320 (S.D.Tex. 1985). In *Siskind*, the Texas Supreme Court held that the defendant's "decision to advertise in Texas telephone directories, in and of itself, is a sufficiently purposeful act...." 642 S.W.2d at 436. A critical distinction to be made between *Siskind* and the instant case is that *Siskind* involved a specific jurisdiction analysis. The causes of action arose from the defendant's contacts; thus, a much lesser showing of contacts was necessary. *See Bearry*, 818 F.2d at 376.

**15.** Judycki stated that Red River advertises on "five or six" billboards in the Texas and Oklahoma panhandles. Further, "[W]hen [the owner] gets a billboard that comes up that isn't being used for the winter months, then he would stick a Red River banner on it." Transcript at 20–21.

**16.** Fifth Circuit case law is currently unclear on whether advertising in local media may confer general jurisdiction and, if so, what level of local advertising is required. On two occasions, however, the Fifth Circuit has held that advertisements in national publications circulated in

Red River's list of contacts with Texas, however, goes on. Red River was originally incorporated in Texas.[17] Four of its five shareholders permanently reside in Amarillo; the other maintains residences in Texas and New Mexico. It recruits ski instructors in Texas.[18] It has done business with Texas travel agencies, who regularly deduct commissions from clients' pre-payments. It regularly mails brochures into Texas. It employs a printer and a CPA in Amarillo.[19] Finally, Red River derives on average 47% of its business—a sobering statistic in this Court's opinion—from Texas.[20] These contacts are not sporadic; they have occurred regularly over a period of time. Viewing the defendant's contacts with Texas *in toto, Holt Oil & Gas,* 801 F.2d at 779, plaintiffs have demonstrated by *prima facie* proof that Red River's contacts with Texas are indeed continuous and systematic.

This conclusion comports with the aforementioned Supreme Court decisions. In holding that continuous and systematic contacts were lacking in *Helicopteros,* the Supreme Court there noted the absence of some important general jurisdiction contacts:

Helicol never has been authorized to do business in Texas and never has had an agent for the service of process within the State. It never has performed helicopter operations in Texas or sold any product that reached Texas, never solicited business in Texas, never signed any contract in Texas, never had any employee based there, and never recruited any employee in Texas. In addition, Helicol never has owned real or personal property and never has maintained an office or establishment there. Helicol has maintained no records in Texas and has no shareholders in that State. None of the respondents or their decedents were domiciled in Texas....

104 S.Ct. at 1870–71. Several potential contacts mentioned by the Court that the defendant there lacked—authorization to do business in Texas, solicitation of business in Texas, recruitment of employees in Texas, presence of shareholders in Texas, and residence of plaintiffs in Texas—are either currently present in the instant case or have been contacts of Red River with Texas at some time in the past.

Today's conclusion is also consistent with *Perkins. Perkins* clarified that a non-resident defendant need only conduct a limited portion of its business in the forum state for general jurisdiction to exist, as long as that limited portion is conducted continuously and systematically. Like the defendant in *Perkins,* Red River has conducted a "necessarily limited" portion of its affairs in the forum state in a continuous and systematic fashion.[21] When such contacts are present, *Perkins* also makes clear that jurisdiction is not dependent upon the defendant's ownership of property in-state. 342 U.S. at 448, 72 S.Ct. at 419–20. In

---

the forum state were insufficient *in the absence of evidence concerning products advertised, how widely the publications were circulated in the state, or the amount of business generated by the ads. Growden,* 733 F.2d at 1151–52; *Loumar,* 698 F.2d at 763–64; *see also Wilkinson,* 645 F.Supp. at 320.

**17.** A non-resident can structure its activities in a manner calculated to shield it from the general jurisdiction of other states. *Bearry,* 818 F.2d at 375–76. There is no indication on the facts before this Court that Red River's reincorporation was intended to shield it from the jurisdiction of courts in Texas.

**18.** The Texas Long–Arm Statute specifically lists the recruitment of Texas residents for employment inside or outside Texas as an act constituting doing business in Texas. Tex.Civ.Prac. & Rem.Code Ann. § 17.042(3) (Vernon 1986).

**19.** These transactions are analogous to purchases within the state. Mere purchases and related trips, standing alone, are not a sufficient basis for general jurisdiction. *Helicopteros,* 104 S.Ct. at 1874. In the instant case, however, purchases do not stand alone.

**20.** The mere receipt of business from residents of another state is not an act purposefully done by the defendant. The Fifth Circuit, however, has implied that evidence of successful solicitation strengthens the solicitation contacts. *See Pedelahore v. Astropark, Inc.,* 745 F.2d 346, 349 (5th Cir.1984); *Loumar,* 698 F.2d at 763.

**21.** Red River's conduct in Texas is a necessarily limited portion of its business because it obviously could not operate a ski resort in Texas.

view of the foregoing, this Court's holding conforms to the *Perkins–Helicopteros* general jurisdiction regime.

*In personam* jurisprudence from the Fifth Circuit has provided this Court with an abundance of reading. Some of these decisions are factually similar because they involve non-resident defendants who own and operate out-of-state resort or amusement facilities to which Texans are attracted through solicitation. In *Wilkerson v. Fortuna Corp.*, 554 F.2d 745 (5th Cir.1977), the Fifth Circuit held that the district court in Texas had properly asserted jurisdiction over a New Mexico corporation which operated a race track just across the Texas–New Mexico border from El Paso. The defendant there did virtually every act imaginable to attract residents of El Paso to attend races in New Mexico, through numerous advertisements on billboards and in newspapers, radio and television, hotels, motels, the El Paso telephone directory, etc. Defendant's office also regularly mailed stall applications to and solicited entries for races from Texas residents. The court noted that location played a major role in its determination, for Texas, unlike New Mexico, forbade parimutuel gambling at the time. *Id.* at 745, 748. In short, the defendant had "saturated" El Paso, had operated a "two-state venture," and, as the court noted, could not have existed without an ordered society in El Paso. *Id.* at 748.

Similarly, the Fifth Circuit found continuous and systematic contacts present in *Pedelahore v. Astropark, Inc.*, 745 F.2d 346 (5th Cir.1984). *Pedelahore* concerned a personal injury suit filed in Louisiana by a Louisiana resident against the corporate owner of Astroworld amusement park in Houston. Astropark's contacts with Louisiana included an ambitious advertising program, including brochures, "thousands" of radio and television spots, and ads in local, national, and regional publications. Astropark also had a ticket consignment agreement with all Louisiana travel agencies authorizing those agencies to sell Astroworld tickets. In addition, Astropark on one occasion conducted a three-day seminar in New Orleans and appointed a sales representative for Louisiana. The Fifth Circuit held that these planned activities, in tandem with their economic fruits,[22] constituted continuous and systematic contacts. *Id.* at 349.

In a case that somewhat represents the opposite end of the spectrum, *Turner v. Jack Tar Grand Bahama, Ltd.*, 353 F.2d 954 (5th Cir.1965), the Fifth Circuit found that the contacts with Texas of a corporation incorporated under the laws of the British Crown Colony of Bahama which operated a hotel in the Grand Bahamas were insufficient for it to be required to defend a suit in Texas. The defendant's contacts with Texas consisted of the Texas residences of its officers and directors and its holding occasional conferences in Houston to discuss business operations. In addition, two Jack Tar hotels in Texas not owned by the defendant booked reservations for defendant, which the court considered "no novel concept." *Id.* at 955 n. 2. The court held that any solicitation activities of defendant in Texas, together with the meetings and residences of officers and directors, were "too remotely related to appellee's 'business' to provide a sufficient basis for *in personam* jurisdiction." [23] *Id.* at 956.

This Court believes that *Wilkerson, Pedelahore,* and *Turner* support today's decision. *Wilkerson* and *Pedelahore* instruct that successful repetitious solicitation of a state's residents may rise to the level of continuous and systematic contacts. Although the advertising in *Wilkerson* and *Pedelahore* seems more intense than Red River's advertising, Red River's Texas

---

22. During the years 1981 to 1983, Louisiana residents comprised 10.3%, 9.7% and 8.0%, respectively, of Astroworld's total patronage.

23. The court held that the Texas residences and conferences did not constitute a sufficient "plus" to prevent application of the "rule" that "solicitation alone is an insufficient basis for *in personam* jurisdiction." *Id.* at 956. In *Pedelahore,* however, the Fifth Circuit held that jurisdiction over the defendant could be asserted on a set of contacts seemingly all aimed at soliciting business. 745 F.2d at 349.

business—47% of its total—is well in excess of the defendant's out-of-state business in *Pedelahore*, in which the Fifth Circuit held that jurisdiction existed. And, Red River has significant contacts with Texas other than those targeted at soliciting business not present in *Wilkerson* and *Pedelahore*. It is also obvious that Red River's level of contacts is well above the defendant's low level in *Turner*. In sum, this Court's conclusion is in harmony with leading decisions of the Supreme Court and of the Fifth Circuit.[24]

## B. Fairness

■ In addition to minimum contacts, due process also requires that the assertion of jurisdiction comport with "traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158. In determining the fairness issue, this Court must examine: 1) defendant's burden; 2) forum state's interests; 3) plaintiffs' interest in convenient and effective relief; 4) judicial system's interest in efficient resolution of controversies; and 5) states' shared interest in furthering fundamental social policies. *Asahi Metal Ind. Co. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026 at 1033, 94 L.Ed.2d 92 (1987); *Irving v. Owens–Corning Fi-*

*berglas Corp.*, 864 F.2d 383, 387 (5th Cir. 1989).

■ In the instant case, the fairness inquiry is easily answered in the affirmative. Texas is New Mexico's neighbor. Texas' proximity to New Mexico, in tandem with Red River's having availed itself of Texas businesses, newspapers, magazines and other media, of Texas residents as prospective employees, and of Texas as the permanent residence of the majority of its shareholders, more than counters any burden on Red River of litigating in Texas. Any burden on Red River is easily justified in light of the substantial economic benefits it derives from Texas residents. *See Pedelahore*, 745 F.2d at 349; *Wilkerson*, 554 F.2d at 749.

Moreover, when minimum contacts have been established, often the interests of the plaintiff and the forum state justify burdens on the defendant. *Asahi Metal*, 107 S.Ct. at 1034. Both the state of Texas and the Kervins have interests in the litigation of this case in Texas. Texans must necessarily leave their home to ski; there are obviously no skiing facilities in Texas. Thus, Texas has an interest in providing an avenue for redressing injuries to its numerous residents whom Red River solicits. *See Holt Oil & Gas*, 801 F.2d at 780; *Pe-*

---

**24.** Another district court in Texas faced a set of contacts strikingly similar to certain contacts in the case at bar in *Wilkinson v. Carnival Cruise Lines, Inc.*, 645 F.Supp. 318 (S.D.Tex.1985). The plaintiff there had suffered injury while on a cruise ship owned and operated by the defendant, a Panama corporation. The defendant's contacts with Texas arose from its relationships with travel agents in Texas and advertisements run in local news media. The former contacts were rather similar to Red River's dealings with travel agents in that the agents acted as independent contractors who routinely contacted the defendant's home office in Miami when approached by a prospective client, received confirmation, sent money, received promotional materials through the mail, and deducted commissions. The defendant's advertising consisted of national advertising that entered Texas as well as frequent advertising in a local newspaper. The district court held that jurisdiction over the defendant was proper, emphasizing the defendant's considerable expenditures for advertising in Texas. *Id.* at 320–21.

The instant case is distinguishable from *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370 (5th

Cir.1987). In *Bearry*, the survivors of plane crash victims sued the manufacturer, Beech, in federal district court. Beech was a Delaware Corporation. The district court had asserted jurisdiction over the defendant under the stream of commerce theory of *in personam* jurisdiction. The Fifth Circuit made clear, however, that the stream of commerce doctrine was inapplicable because it is a specie of specific jurisdiction, which did not exist in the case. *Id.* at 375. Beech's general contacts consisted of a distribution network in Texas, advertising efforts in Texas, and conducting nearly $250,000,-000 of business in Texas. The court found general jurisdiction lacking because the defendant had arranged its activities so as to shield it from the general jurisdiction of other states by carefully requiring the negotiation, completion, and performance of all contracts in Kansas, which a defendant is free to do. This refuted any notion that the defendant had constructively consented to being sued in the state. *Id.* at 375–76. There is no evidence before the Court that Red River has in any way structured its conduct in a manner calculated to avoid the jurisdiction of courts in Texas.

*delahore,* 745 F.2d at 349. This interest is augmented by the reality that in litigation similar to the case *sub judice,* where Texas residents are injured at an out-of-state resort, specific *in personam* jurisdiction will frequently be unavailable, since plaintiffs' causes of action will ordinarily arise from alleged tortious conduct in another state unconnected to defendants' contacts with Texas. *See Bearry,* 818 F.2d at 337. Yet another interest of Texas is demonstrated by a provision of its long-arm statute particularly enumerating recruitment of Texas residents for employment—in this case as ski instructors—as an act constituting doing business in Texas. Tex.Civ.Prac. & Rem.Code Ann. § 17.042(3). The Kervins also have an interest in litigating in Texas. Texas is their home and is convenient for their witnesses.[25]

Retention of this case also furthers the efficiency of the judicial system. This case is currently on the Court's active docket and has been given an August, 1989, jury selection date, approximately only four months from the date of this opinion. Finally, the interests of the several states seems unimportant in this case. The only other state involved here is New Mexico. New Mexico has an obvious interest in the safety regulation of its ski resorts. The instant claim, however, which involves allegedly unsafe steps at defendant's ski lodge, does not concern any facility or laws directly related to the ski industry. It is an accident that could have happened anywhere. Any other interests of New Mexico would seem far outweighed by the factors discussed above.

## V. CHANGE OF VENUE

Defendant also moves this Court to transfer the case to the District of New Mexico pursuant to 28 U.S.C. § 1404(a), which authorizes discretionary venue transfers of a case to any other district or division where it might have been brought "[f]or the convenience of parties and witnesses...." Defendant's venue transfer argument is comprised of conclusory statements concerning the location of witnesses and arguments concerning a jury's ability to view Red River's premises and the applicability of New Mexico law to the case. On the other hand, plaintiffs' response to this motion specifically identifies expert and fact witnesses to be called at trial and their addresses. Plaintiffs and their witnesses all reside far closer to this Court than to New Mexico. Further, if needed, Red River can compel the attendance of witnesses outside the subpoena power of this Court who are its employees, a luxury not enjoyed by plaintiffs. The facts before this Court most assuredly do not cut in favor of a venue transfer.

Finally, Red River has also made reference to 28 U.S.C. § 1406(a), which permits a district court to transfer a case when venue is improper. Since this Court has *in personam* jurisdiction over Red River, venue in the Eastern District of Texas is proper pursuant to 28 U.S.C. § 1391(a) because plaintiffs reside in this district.

Motions denied.

---

25. In their response to Red River's motion for a change of venue, plaintiffs point out that Mrs. Kervin's primary treating physician resides in this district near Beaumont; another physician who examined her resides in Houston. Plaintiffs have also identified two eyewitnesses who reside in this district and in Arkansas. Finally, plaintiffs themselves reside near Beaumont.